## BROWN v. SPLIT COACH MOTOR CORPORATION.

### No. 1095.

District Court, D. Delaware.
April 6, 1937.

Archibald Palmer, of New York City, and Leonard G. Hagner, of Wilmington, Del., for plaintiff.

Ward & Gray and Paul Leahy, all of Wilmington, Del., for defendant.

NIELDS, District Judge.

Carleton Brown, a citizen of Canada, charges Split Coach Motor Corporation, a Delaware corporation, with infringement of four United States letters patent granted to him in 1934 for improvements in an automobile trailer with lateral and vertical expansion features known as a "split coach." The application for each of the patents was filed before February 16, 1931, when plaintiff and defendant parted company and plaintiff ceased to exercise any authority in the management of defendant.

The usual injunction bill was filed. In its answer defendant avers "that it has and is operating under a license or operating agreement from the plaintiff, whereunder the defendant is empowered to manufacture, sell and use the devices and apparatus which are covered by the Letters Patent in suit; that said license or operating agreement was entered into between the plaintiff and defendant on the 18th day of August, 1932, whereby plaintiff agreed to and did give and grant unto the defendant, its assigns and successors in interest, the exclusive right and privilege to manufacture and sell split coaches involving the use of any and all American and Canadian Patents owned or then pending in the plaintiff's name pertaining to split coaches,

for a period of five years from the date of said agreement; that the Patents here in suit are included in said agreement or license; that the defendant has not infringed or violated any rights of the plaintiff but has operated in accord with the terms of said agreement." In a replication to the answer filed pursuant to an order of court under Equity Rule 31, 28 U.S.C.A. following section 723, plaintiff traverses the plea of license and avers that an option agreement, referred to in the answer as a license, was made between the parties on August 18, 1932, before said patents were granted, and was terminated by its own terms and conditions on January 1, 1933.

The ultimate issues in the case are not framed by the pleadings but were evolved by the proofs at the hearing. The relief in this suit is confined to the happenings after August 18, 1932. From the proofs the positions of the parties may be fairly stated as follows:

Plaintiff contends that by the terms and conditions of the license of August 18, 1932, the license was terminated as defendant (1) paid no royalties, (2) failed to exploit plaintiff's inventions, and (3) did not act in good faith. That by said acts and conduct of defendant, plaintiff is entitled to a decree of this court declaring the license of August 18, 1932, forfeited, canceled, and rescinded. That all sales of coaches thereafter (January 1, 1933) were infringements of plaintiff's patents because there was then no license.

Defendant contends that the coaches sold by defendant after August 18, 1932, were by the terms of the license of August 18, 1932, free from royalty payments and therefore there could be no infringement. That the license agreement of August 18, 1932, contains an express provision: "The party of the first part [the plaintiff] agrees that the party of the second part [the defendant], or its assigns and successors in interest, shall not pay any royalty or commission on the sale of the completed coaches now possessed by the party of the second part, or on the fabricated parts now owned, as such, or assembled into completed units." In other words the license itself provides that defendant should not pay any royalty or commission on the sale of the completed coaches possessed by defendant on August 18, 1932, or on the fabricated parts then owned as such or assembled into completed parts. That all

split coaches manufactured or sold by defendant after August 18, 1932, were excepted from royalty payments under the provision above quoted.

Plaintiff had mechanical experience. During the war he was in charge of the mechanical transportation of the Fourth Canadian Division. He had been purchasing agent of a steamship line. Afterwards he became district sales manager of the Ford Motor Company and of the Cadillac Company at Montreal. His first model for a trailer or split coach was built in Montreal back in 1926. N. A. Timmins of Montreal was president of N. A. Timmins Corporation operating mining properties. He saw a model of a split coach and offered to form a limited partnership with Brown to finance the inventions. To that end the N. A. Timmins Corporation advanced Brown $12,000. It was agreed, at this stage, that a company should be organized in which Brown should have a 40 per cent. interest for the assignment of his patents and the Timmins Corporation a 60 per cent. interest for the advances of money. The partnership placed an order for the manufacture of 809 Brown split coaches with the Martin-Parry Company of York, Pa. In May, 1929, defendant was incorporated and the capital stock was issued in the proportions previously agreed upon. The Martin-Parry order was then covered by a contract with defendant.

Meanwhile, Brown applied for his patents. He became the chief executive officer of defendant. He hoped to dispose of the 809 trailers within nine months. The Timmins Corporation advanced to Brown and to defendant $771,500 to promote the inventions. The Martin-Parry contract for the manufacture of 809 split coaches was never completed. Defendant was forced to take over the coaches already assembled, together with the fabricated parts for coaches not assembled.

Plaintiff attempted to sell the coaches taken from the Martin-Parry Company by exhibiting them at motor shows in New York City, Minneapolis, Kansas City, Los Angeles, and Montreal, but not a single sale resulted from this sales promotion. An arrangement was made by plaintiff with Sears Roebuck & Co. under which the sales facilities of 57 stores throughout the country were to be exerted for eight months. 240 coaches were sent to Sears Roebuck & Co. and only 20 coaches were sold. The remaining 220 coaches were placed in storage and some were sold to pay storage charges. Plaintiff, as executive head of defendant, had 14 salesmen and, at one time, as many as 420 people employed. He engaged 16 district managers and many salesmen. He carried through an advertising campaign to educate the public. In 1930 while plaintiff was the chief executive, defendant was only able to sell 93 coaches. From 1929 to 1930 the net loss from defendant's operations was $185,318.19. For 1931 the net loss was $173,616.91. February 16, 1931, plaintiff was discharged. Plaintiff's management was a failure. His salary of $500 a month and his authority over the management of defendant ceased.

Thereupon plaintiff brought suit in Montreal against N. A. Timmins Corporation, his benefactor. Subsequently the suit was discontinued and plaintiff received an option to purchase the stock of defendant held by N. A. Timmins Corporation. This option was extended from time to time. Originally it called for the payment of $100,000 but was reduced to $50,000 and later to $30,000.

April 7, 1932, the parties to this suit executed a general release in which the N. A. Timmins Corporation and N. A. Timmins joined. Each released the others from all sums of money, claims, and demands whatsoever, except amounts due from Brown or the defendant to N. A. Timmins Corporation. As a result of this release all patents relating to split coaches, including the Follet patent, were reassigned to plaintiff.

August 11, 1932, a meeting of the directors of defendant was held in York, attended by plaintiff. The directors discussed the above release and its effect on the Brown patents. The directors emphasized the importance to defendant of the right to sell without royalty payments the coaches already assembled and thereafter to be assembled from parts on hand and the sale of parts as such already manufactured. The directors discussed the right of defendant to continue to manufacture and sell under the Brown patents. On motion of Wilshire seconded by Brown they authorized the officers to execute an agreement covering these matters.

Accordingly on August 18, 1932, the parties to this suit with the N. A. Timmins Corporation executed an agreement embodying an option, a license, and the

coaches expressly excepted from royalty payments, in words as follows:

"Whereas, The N. A. Timmins Corporation of Montreal, Canada, has entered into an agreement with and has given an option to Carleton Brown for the sale to him of the shares of stock of Split Coach Motor Corporation owned by it, and

"Whereas, numerous extensions of the time for the carrying out of said agreement and option on the part of Carleton Brown have been granted by The N. A. Timmins Corporation, the last extension being for a period of thirty days from July 20, 1932, expiring August 20, 1932, and

"Whereas, under date of April 7, 1932, The N. A. Timmons Corporation, N. A. Timmins, Split Coach Motor Corporation, and Carleton Brown, entered into a certain release whereby each released the others generally, exclusive of any amounts owing or that may become owing to The N. A. Timmins Corporation by Carleton Brown, or by Split Coach Motor Corporation under the above referred to agreement and option on the part of The N. A. Timmins Corporation to sell its shares in Split Coach Motor Corporation to Carleton Brown, and

"Whereas, all patents pertaining to Split Coaches, including the Follet patent became the property of Carleton Brown as the result of the above referred to release dated April 7, 1932, but the said Split Coach Motor Corporation was and is desirous of renewing certain exclusive operating rights under all American and Canadian Split Coach patents granted or pending in the name of Carleton Brown, and the said Carleton Brown is willing to give and grant to said Split Coach Motor Corporation, its assigns and successors in interest, such rights to operate under said patents pertaining to Split Coaches, under the terms hereinafter set forth—if the said Carleton Brown does not exercise his option to purchase said shares of stock in Split Coach Motor Corporation owned by The N. A. Timmins Corporation prior to August 20, 1932.

"Now, therefore, know all men by these presents: That in consideration of the premises and for value received, and in view of the numerous extensions granted to Carleton Brown on the part of The N. A. Timmins Corporation for the purchase by Carleton Brown of its shares of stock in Split Coach Motor Corporation, and

for the further consideration of One Dollar, the receipt of which is hereby acknowledged, paid to Carleton Brown by Split Coach Motor Corporation, Carleton Brown, hereinafter known as party of the first part, hereby agrees to and does give and grant unto Split Coach Motor Corporation, its assigns and successors in interest, hereinafter known as party of the second part, the exclusive right and privilege to manufacture and sell Split Coaches involving the use of any and all American (and Canadian) patents owned or now pending in his name pertaining to Split Coaches, for a period of five (5) years from the date of this agreement, in consideration of which the party of the second part shall pay quarterly to Carleton Brown, a royalty or commission for the operating rights of said patents of four per cent on the entire sales of Split Coach Motor Corporation which shall be based on the factory invoiced price and not the ultimate retail price. Failure on the part of the party of the second part to pay the party of the first part any royalties or commissions within thirty days after the conclusion of each quarterly due date will result in the automatic cancellation of the patent operating rights granted herein by the party of the first part to the party of the second part —the first quarterly period to begin September 1, 1932.

"The party of the first part agrees that the party of the second part, or its assigns and successors in interest, shall not pay any royalty or commission on the sale of the completed Coaches now possessed by the party of the second part, or on the fabricated parts now owned, as such, or assembled into completed units.

"The party of the second part shall exercise good faith in aggressively exploiting the sale of Split Coaches and shall aggressively exploit its operating rights so that its conduct is reasonable and fair under all the circumstances.

"The terms of this contract shall become operative and in effect only if the said Carleton Brown fails to exercise his option to purchase the shares of Split Coach Motor Corporation owned by The N. A. Timmins Corporation, hereinabove set forth.

"In the event of the party of the second part going into liquidation or bankruptcy, all the patent operating rights herein granted shall be automatically cancel-

led and revert to the party of the first part. However, if a purchaser at liquidation or bankruptcy desires to continue the manufacture and sale of Split Coaches, then the party of the first part shall thereupon reinstate with the new purchaser all the patent operating rights herein contained provided said purchaser undertakes to carry out all the obligations outlined herein and agrees in writing that he intends to aggressively exploit such patent operating rights.

"The N. A. Timmins Corporation joins in this agreement as a party and consents to the terms thereof.

"In witness whereof, the parties hereto have set their hands and seals this 18th day of August, A. D. 1932."

Plaintiff failed to purchase the shares in defendant owned by N. A. Timmins Corporation on or before August 20, 1932, as provided in the agreement above recited. Thereupon the license of defendant to manufacture and sell under the Brown patents became effective for a period of five years thereafter. All of which was fully understood by plaintiff as appears from the record:

"Q. 55  On the 18th of August, you had an outstanding option which was due in two days?  A. Correct.

"Q. 56  And they at that time put this agreement before you to let them use your United States patents and the Canadian patents, other than the Follet patent, for a period of five years, giving you a two days' option to raise the money?  A. Correct.

"Q. 57  This was in 1932, in the heart of the depression?  A. Correct.

"Q. 58  You did not raise the money at that time?  A. I did not."

August 25, 1932, the N. A. Timmins Corporation, through the general sales manager of defendant, extended Brown's option until October 1, 1932, under the terms and conditions set forth in the following communication which Brown accepted:

"Mr. Carleton Brown          August 25, 1932
"York, Pa.
"Dear Mr. Brown:
"I am instructed by The N. A. Timmins Corporation to advise you that they are agreeable to granting you an extension of your option to purchase their interests, to Saturday, October 1st, under the following conditions:

"A—You are to enter into an agreement to grant to the Split Coach Motor Corporation an exclusive right to operate any and all United States Split Coach patents which are now granted or which have been applied for, or which may later be granted or applied for, and including the Follet patent, during the life of said patents.

"B—You are to enter into an agreement that in return for said exclusive operating right that you will receive a royalty based on the net factory price, of an amount which is to be specified by Featherstonhaugh & Co. as representing a fair royalty, taking into consideration the nature of the product and the usual royalties paid in the automotive industry.

"C—You are to give The N. A. Timmins Corporation a letter which will stipulate that if you are successful in raising the necessary capital you will purchase their interests in the Split Coach Motor Corporation under the terms of the agreement of January 21, 1932, and that no changes which have occurred in the position of the Split Coach Motor Corporation since the 21st. of January, 1932 to the expiry of this extension will affect the purchase price and conditions as outlined in that agreement except that in lieu of this agreement you may submit a counter proposal to pay The N. A. Timmins Corporation the purchase price of their interests in cash, or part cash and part notes to be endorsed by parties satisfactory to Mr. Robert C. Fluhrer, and if any such change is submitted by you you are to undertake in your offer to assume all liabilities of any nature whatsoever which are now or which may become obligations of the Split Coach Motor Corporation.

"This extension is granted to you on the understanding that the N. A. Timmins Corporation, during the period of this extension, will not take any action to force the Split Coach Motor Corporation into liquidation. However, if any creditor of the Split Coach Motor Corporation takes action which necessitates the Split Coach Motor Corporation going into voluntary liquidation, then so as not to jeopardize the interests of The N. A. Timmins Corporation and other creditors, the Split Coach Motor Corporation are at liberty to go into voluntary liquidation or take any other

steps which may be necessary to protect their interests.

"Yours very truly,
"[Signed] H. D. W.
"H. D. Wilshire,
"General Sales Manager.
"The above accepted
"[Signed] Carleton Brown
"Aug. 26th, 1932
"HDW:jmh"

By the acceptance of the terms of the communication of August 25, 1932, plaintiff obtained an extension of time within which to purchase the stock of defendant owned by the N. A. Timmins Corporation. In consideration whereof, plaintiff agreed to execute a formal contract granting to defendant an exclusive right to manufacture and sell split coaches involving the use of any and all American patents, including the Follet patent, owned or issued to or now pending in plaintiff's name, pertaining to split coaches during the remaining life of each of said patents; plaintiff was to receive a royalty under said license of 2½ per cent. of the entire sales of defendant based on the factory invoice price.

Plaintiff received this option covering the period from August 20, 1932, to October 1, 1932, yet refused to execute the formal agreement carrying out the terms of the promises contained in the accepted communication of August 25, 1932. This formal contract was tendered to plaintiff in York, Pa., before October 1, 1932, later in New York, and afewards in Montreal, Canada.

November 28, 1932, plaintiff procured a further option from the N. A. Timmins Corporation as follows:

"November 28th, 1932.
"Mr. Carleton Brown,
"4962 Grosvenor Avenue,
"City.
"Dear Sir:—
"We will sell to you our entire stock holdings, and all other interests in the Split Coach Motor Corporation whatsoever, and turn over complete control of the Company to you, for the sum of Thirty Thousand Dollars ($30,000.00), payable in New York Funds.

"We retain the right to cancel this offer at any time upon giving you due notice to the above address.

"Yours truly,
"[Signed] J. J. Rankin,
"Managing Director."

This was the last option extended to Brown and was formally canceled by the N. A. Timmins Corporation in the following letter:

"4th August, 1933.
"E. Carleton Brown, Esq.
"c/o San Carlos Hotel
"150 East 50th Street
"New York City
"U. S. A.
"Dear Sir:
"This letter is to notify you that the option granted to you by The N. A. Timmins Corporation to buy our shares of stock of Split Coach Motor Corporation is cancelled and terminated.

"This letter is written to confirm similar advice contained in Mr. R. C. Fluhrer's letter to you of the 21st ultimo.

"Yours faithfully,
"[Signed] L. A. Sewell,
"Secretary-Treasurer."

Plaintiff never raised the sum of $30,000 in the interval between August 18, 1932, and August 20, 1932; neither was he able to raise said sum between August 25, 1932, and October 31, 1932; nor was he able to raise said sum between October 31, 1932, and August 4, 1933, the date of the cancellation of the last option. Plaintiff never had $30,000 on deposit with the Chase National Bank. Such sum was on deposit in the name of National Roadside Diner Corporation of which plaintiff was an officer. There is no evidence that plaintiff had the right to use that sum in purchasing shares of stock of defendant.

Defendant assisted plaintiff in his efforts to raise $30,000 by lending him a coach for demonstration purposes and lending him money. The N. A. Timmins Corporation gave plaintiff $1,200 to assist him in floating a bond issue. In fact defendant gave plaintiff every opportunity to raise the $30,000.

August 18, 1932, defendant had on hand 474 coaches assembled or unassembled. From that date until the date of trial defendant sold 464 coaches and there remain 10 coaches unsold. Stated differently, on August 18, 1932, there were 323 completely assembled coaches on which no royalty was due. Afterwards 151 partly assembled coaches were completely assembled from fabricated parts on hand. Merely accessory materials were required to complete these coaches, such as wood, fittings, screws, bolts, glass, etc. No new split

coaches were manufactured or sold by defendant. In fact since 1935 defendant has manufactured a light trailer. It was forced to abandon the Brown split coach.

The situation on August 18 and 20, 1932, may be briefly summarized as follows.

323 coaches assembled, some with and some without motor tires
1 experimental chassis
38 in process of assembly with chassis
15 passenger chassis assembled
97 unassembled chassis frames

474 total

Plaintiff has failed to prove that any royalty was due or that the license should be forfeited. It follows that plaintiff has failed to prove that he had the right to cancel the license for unpaid royalties on December 28, 1933, or at any other time.

There is no proof that defendant failed to exploit the Brown inventions or was lacking in good faith. On the contrary the evidence is all the other way. In 1933 defendant installed coaches in the Chicago World's Fair to promote sales but no sales resulted. In 1934 defendant sold over 100 Brown coaches directly or indirectly to the Army. The Army, theatrical folk, and sportsmen were the only persons who showed any interest in the Brown split coach. At this time distributors gave trade acceptances for coaches. When they failed to make sales they repudiated the trade acceptances and defendant was compelled to take back the coaches.

The Brown coaches were designed in 1929 and gradually grew obsolete. They were heavy and cumbersome in design. The buying public disliked to take the time and trouble to expand a split coach and preferred a coach of small and light design.

In exploiting plaintiff's invention defendant suffered the following losses:

1932 .................... $238,544.67
1933 .................... 125,083.21
1934 .................... 19,794.12
1935 .................... 36,344.19

Moreover in exploiting plaintiff's invention the N. A. Timmins Corporation spent more than one million dollars.

The court makes the following findings:

1. That from and after August 20, 1932, defendant held a valid license to manufacture and sell the devices and split coaches covered by the patents in suit.

2. That defendant was guilty of no acts or conduct warranting this court in declaring said license forfeited or canceled.

3. That plaintiff never legally exercised any option to purchase the stock belonging to the N. A. Timmins Corporation in defendant.

4. That the split coaches sold by defendant were expressly excepted from royalty payments by the terms of the license agreement.

5. That there is no proof of infringement of plaintiff's patents by defendant that would justify the court in issuing an injunction or affording other equitable relief.

This opinion contains a statement of the essential facts in conformity with Equity Rule 70½, 28 U.S.C.A. following section 723.

The bill of complaint must be dismissed.